# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                              Criminal No. 07-99 (JRT/SRN)

                      Plaintiff,

          v.                                          **REPORT AND RECOMMENDATION**

Jhonnathan Deleon-Bayardo (1),
Manuel Inda-Galaviz (2),
Ramon Aguilar-Lizama (3), and
Hector Martinez-Bueno (4),

                      Defendants.

---

Andrew S. Dunne, Esq., Assistant United States Attorney, on behalf of the Government

Nancy R. Vanderheider, Esq., on behalf of Defendant Jhonnathan Deleon-Bayardo

Robert M. Paule, Esq., on behalf of Defendant Manuel Inda-Galaviz

Timothy R. Anderson, Esq., on behalf of Defendant Ramon Aguilar-Lizama

Caroline Durham, Esq., Assistant Federal Defender, on behalf of Defendant Hector Martinez-Bueno

---

SUSAN RICHARD NELSON, United States Magistrate Judge

        The above-entitled matter comes before the undersigned United States Magistrate Judge on

Defendant Jhonnathan Deleon-Bayardo's Motion to Suppress Physical Evidence Obtained as a Result

of Searches, Seizures, or Identification Procedures (Doc. No. 59); Defendant Manuel Inda-Galaviz's

Motion to Suppress Physical Evidence (Doc. No. 43) and Motion to Suppress Statements,

Admissions, and Answers (Doc. No. 47); Defendant Ramon Aguilar-Lizama's Motion to Suppress

1

Any Evidence Found Incident to Unlawful Arrest (Doc. No. 36), Motion to Dismiss Counts 1 and 2 of

the Indictment (Doc. No. 37), Motion to Suppress Any Evidence Obtained as a Result of Search and

Seizure (Doc. No. 38), and Motion to Suppress Statements, Admissions, and Answers (Doc. No. 39);

and Defendant Hector Martinez-Bueno's Motion to Suppress Evidence (Doc. No. 73), Motion to

Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 74), Motion to Suppress

Statements, Admissions, and Answers (Doc. No. 75), and Motion to Suppress Eyewitness

Identifications (Doc. No. 79.)  This case has been referred to the undersigned for resolution of pretrial

matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

## I.    BACKGROUND

An Indictment was filed on March 27, 2007, charging each Defendant with two counts:

(1) conspiracy to possess and distribute heroin, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846,

and (2) possession of heroin with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§

841(a)(1) and 841(b)(1)(B).  (Doc. No. 22.)

Gregory Peterson, a police officer with the Richfield Police Department (RPD); Sergeant

Shawn Flaherty, a police officer with the RPD; and Michael Kaulfuss, an investigator with the Federal

Defender's Office, testified at the criminal motions hearing.  The following exhibits were received in

evidence at the hearing:

Gov't Ex. 1: an application, affidavit, search warrant, and receipt and inventory return for a

residence in Richfield, Minnesota;

Gov't Ex. 2: an application, affidavit, search warrant, and receipt and inventory return for a

storage locker in Minneapolis, Minnesota;

Gov't Ex. 3: a computer printout containing four photographs, one of each Defendant;

Gov't Exs. 4, 5, 6, and 7: transcripts of interviews of each Defendant, conducted at the RPD;

Gov't Exs. 8A, 8B, 8C, and 8D: computer printout photo arrays, each one consisting of one photograph of a Defendant and five other photographs;

Gov't Ex. 10: a computer printout of a photograph of the stovetop of a residence in Richfield, Minnesota; and

Def. Exs. 1, 2, 3, 4, 5, 7, 8, and 11: computer printouts of photographs of the exterior and interior of an apartment complex in Richfield, Minnesota.

This matter is set for trial before United States District Judge John R. Tunheim on a date to be determined.

## II.   FACTS

According to Officer Peterson's testimony at the criminal motions hearing, the RPD began investigating possible heroin and cocaine trafficking from a Richfield apartment ("the Apartment") in January 2007 after receiving a tip from a confidential informant (CI). The CI identified the Apartment for police officers by describing its window screens as torn or out of place, and located on the southwest corner of the building. The CI later pointed out the exact unit, which police eventually identified as unit 202. The CI also described the occupants of the Apartment as Hispanic males who used nicknames, including Pepe and George or Jorge. Finally, the CI informed the RPD that the individuals used a vehicle in selling the controlled substances.

On February 28, 2007, Officer Peterson, along with Officer Mark Meyer of the Metropolitan Airport Police and Officer Meyer's canine partner, Brio, went to the complex in which the Apartment

3

was located for the purpose of conducting canine sniffs of the Apartment, as well as another apartment

in a nearby complex.  The RPD had obtained permission from the owners of the complexes to enter the

building's hallways and execute canine sniffs.  When the officers arrived at the apartment complexes,

Officer Peterson and Officer Meyer decided to conduct the canine sniff of the other apartment first.

The other apartment was located in a building immediately to the east of the building containing the

Apartment.  As they approached this other building, Officer Peterson observed two Hispanic males,

later identified as Defendants Deleon-Bayardo and Inda-Galaviz, together inside the foyer and just

outside of the Apartment building.  Officer Peterson believed that the men were watching them as they

led Brio through the other building.  Eventually, the officers came to the building containing the

Apartment.   Officer Peterson told Officer Meyer to walk Brio in order to dispel suspicion.

Officer Meyer and Brio walked away, and Officer Peterson proceeded to the front of the

building containing the Apartment.  He attempted to gain entry by randomly pressing buttons on the

security panel but was not successful.  Officer Peterson motioned to Defendant Deleon-Bayardo to let

him into the building with his key, but Defendant Deleon-Bayardo indicated he could not open the door.

Defendant Deleon-Bayardo then made a phone call on his cellular phone.  Defendant Inda-Galaviz

came down the stairs and opened the front door of the building, and then he walked to the parking lot.

Defendant Deleon-Bayardo and Officer Peterson both entered the building.  Officer Peterson observed

Defendant Deleon-Bayardo walk to the second floor of the building, where the Apartment was located.

Officer Peterson then opened the building's door for Officer Meyer and Brio.

The two officers and Brio proceeded to the Apartment.  At Officer Meyer's direction, Brio

began sniffing around the Apartment's door seam.  Brio then alerted the officers to the presence of

4

controlled substances by sitting in front of the Apartment door, which is her trained method of indicating the presence of such substances. Officer Peterson's plan was to conduct the canine sniff, exit the building unnoticed, and procure a search warrant.

Unexpectedly, Defendant Deleon-Bayardo opened the Apartment door and saw the officers and Brio standing in front of the door. Officer Peterson asked Defendant Deleon-Bayardo if he lived at the apartment, to which Defendant Deleon-Bayardo replied that he did not. Officer Peterson then asked him if anyone else was there, and he said no. Defendant Deleon-Bayardo then withdrew into the apartment, and the door began to close. Officer Peterson did not know whether the door was spring-loaded or if it was closing for another reason. Officer Peterson decided to freeze the apartment and obtain a search warrant, and he stepped into the threshold of the apartment to prevent the door from closing. Officer Peterson dispatched Officer Meyer and Brio to find Defendant Inda-Galaviz.

From the threshold of the door, Officer Peterson saw Defendant Deleon-Bayardo in a three-foot hallway between the living room and the kitchen. He noticed a baggie at Defendant Deleon-Bayardo's feet and a marijuana pipe on the kitchen stove. Defendant Deleon-Bayardo attempted to make a phone call, but Officer Peterson stopped him because he did not want Defendant Deleon-Bayardo to alert Defendant Inda-Galaviz or anyone else. Officer Peterson confiscated Defendant Deleon-Bayardo's telephone and pat-searched Defendant Deleon-Bayardo for weapons but found none. Officer Peterson directed Defendant Deleon-Bayardo to sit in the hallway of the Apartment. He called RPD dispatch from his cellular phone and requested officers to respond and assist. He also advised the dispatcher that he was looking for a second suspect. Officers Blair and Seeve soon arrived at the Apartment, and Officer Blair took control of Defendant Deleon-Bayardo.

Officer Peterson then conducted a protective sweep of the Apartment to look for other people and ensure his safety.  The sweep lasted approximately one minute.  About this same time, Officer Seeve called Officer Peterson to report that he had located a vehicle being driven by a person matching the description given by Officer Peterson to dispatch.  The vehicle, a green Ford Explorer, was parked so that Officer Peterson could see it from the Apartment window.  He asked Officer Seeve to have the driver exit the car, and Officer Peterson recognized the driver as Defendant Inda-Galaviz, whom Officer Peterson had previously seen with Defendant Deleon-Bayardo.  Defendant Aguilar-Lizama was a passenger in the vehicle.  Officer Seeve conducted a pat-down search of Defendants Inda-Galaviz and Aguilar-Lizama, which revealed no weapons, and Officer Seeve brought the two Defendants to the Apartment.  No drugs were recovered from the Ford Explorer.

Meanwhile, Officer Peterson was coordinating with Officer Sean Majewski, who was not present at the Apartment, to obtain a search warrant for the Apartment and the Ford Explorer.  After determining that none of the Defendants could communicate effectively in English, Officer Peterson decided they should be transported to the RPD for interviewing with the aid of a translator.  Defendants were handcuffed and were not free to leave.  Prior to transporting Defendants, Officer Seeve searched Defendant Deleon-Bayardo and felt something in his front pants pocket.  Officer Peterson pulled out the item, which turned out to be two small balloons of suspected heroin.  Officers also recovered two cellular telephones and a set of keys to the Apartment.

After all of the other officers and Defendants left the Apartment, Officer Peterson locked the Apartment door using Defendant Deleon-Bayardo's key and remained inside to wait for the search warrant.  At some point, he heard someone throwing something at the window.  Officer Peterson

6

looked out and saw Defendant Martinez-Bueno throwing a snowball at the Apartment's window. Officer Peterson watched Defendant Martinez-Bueno walk to the parking lot and enter a vehicle parked next to the Ford Explorer.  Officer Peterson called dispatch and reported the license plate number of the vehicle.  He wanted to question Defendant Martinez-Bueno about suspected drug trafficking from the Apartment.

Sergeant Shawn Flaherty of the RPD responded to the resulting call from dispatch and stopped Defendant Martinez-Bueno's vehicle.  Sergeant Flaherty testified that the car was a silver 1990 Toyota Corolla and contained two occupants: the driver Dana Gagnon and Defendant Martinez-Bueno.  In response to questioning, Gagnon told Sergeant Flaherty that he had drug paraphernalia, specifically, hypodermic needles, in the car, but no drugs.  Because possession of drug paraphernalia is a citeable offense, Sergeant Flaherty asked the driver and Defendant Martinez-Bueno to step out of the vehicle. He smelled a strong odor of marijuana emanating from Defendant Martinez-Bueno's person.  Sergeant Flaherty pat-searched him and discovered 13.4 grams of marijuana and $745.  He then secured Defendant Martinez-Bueno in his squad car, and Defendant Martinez-Bueno was later taken to the RPD.

Meanwhile, Defendants arrived at the RPD where they were searched, advised of their Miranda rights, photographed, booked, and interviewed.  The search of Defendant Inda-Galaviz revealed a large quantity of heroin in his clothing.  Officer Drayna interviewed Defendants Aguilar-Lizama and Inda-Galaviz with the aid of an interpreter.  Defendant Inda-Galaviz admitted to staying in the Apartment for the past three days.  Officer Drayna compiled a photograph composite of the four Defendants' booking photographs and took it to the Apartment.

Still waiting for the warrant, Officer Peterson saw another car arrive in the parking lot and park next to the Ford Explorer.  Because he had exhausted the available supply of squad cars, Officer Peterson locked the Apartment and went to the parking lot himself.  He encountered three occupants of the vehicle and briefly interviewed them.  Yet another car arrived, and either Officer Peterson or another officer spoke with the occupants, Michael Gow and Melissa Kennedy.  Gow admitted he had come to the apartment complex to buy heroin.  Because there was an outstanding warrant for his arrest, he was taken into custody.  Kennedy was released.

The search warrant arrived about forty minutes later, and officers searched the Apartment and the Ford Explorer.  The search of the Apartment yielded a large quantity of heroin, cocaine, digital scales commonly used in narcotics trafficking, and $17,000 to $27,000 in cash.  Officers also found paperwork with Defendant Inda-Galaviz's name.  The Ford Explorer also contained paperwork for a storage locker in Minneapolis.[1]

While the officers were searching the Apartment, a visitor later identified as Michael Bell arrived.  Bell told the officers he was there to buy heroin.  The officers showed Bell the photograph composite brought to the scene by Officer Drayna.  In addition to the booking photographs, the composite contained computer-generated notes under each photograph, such as Defendants' names, birthdates, and whether he had invoked his Miranda rights.  Bell stated that he recognized Defendants Deleon-Bayardo and Martinez-Bueno in connection with the Apartment.

Subsequent to February 28, 2007, Officer Peterson interviewed Kennedy, Bell, and

---

[1] The investigating officers obtained a warrant for the storage locker and executed a search there two days later.  The search yielded a large amount of cash, among other items.

Scott Glen, who had been identified as the owner of the Ford Explorer. The witnesses were also

shown photograph lineups containing images of Defendants, generated by the RPD. At the criminal

motions hearing, Officer Peterson described the process by which the lineups were created. Each of

the four lineups contained one photograph of a Defendant and five other photographs. The other

photographs were randomly selected by the computer for close resemblance to the respective

Defendant's photograph. Glen identified Defendant Deleon-Bayardo as one of the residents of the

Apartment. Kennedy identified Defendants Deleon-Bayardo, Inda-Galaviz, and Martinez-Bueno as

connected to the Apartment. Bell identified Defendants Deleon-Bayardo and Martinez-Bueno in

connection with the Apartment. All of the interviews were tape recorded.

## III.    MOTIONS TO SUPPRESS EVIDENCE OBTAINED FROM THE PROTECTIVE SWEEP AND INITIAL INVESTIGATORY DETENTIONS

All Defendants move to suppress evidence on the grounds that prior to the officers' search of

the Apartment pursuant to the warrant, Defendants were subjected to illegal investigatory detentions

and/or arrests in violation of the Fourth Amendment.

### A.    Standard for a Lawful Investigatory Stop

An investigatory detention, which is a brief seizure by police based on a reasonable suspicion of

criminal activity, is a narrow exception to the Fourth Amendment's probable cause requirement. See

Terry v. Ohio, 392 U.S. 1, 26-27 (1968). In Terry, the Supreme Court held that a police officer may

stop and briefly question a person who is reasonably suspected of criminal activity. Id. at 22-24. The

officer may also perform a limited pat-down search for weapons if the officer believes the person is

armed and dangerous. Id. The officer must have a reasonable, articulable suspicion of criminal activity

in order to conduct the investigatory detention, id. at 21-22, which has come to be known as a <u>Terry</u> stop. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. <u>Id.</u> at 21. An officer may rely on the information known by a team of officers involved in an investigation to provide justification for a <u>Terry</u> stop. <u>United States v. Ortiz-Monroy</u>, 332 F.3d 525, 529 (8th Cir. 2003) (citing <u>United States v. Robinson</u>, 119 F.3d 663, 666-67 (8th Cir. 1997)).

Regarding the limited pat-down search for weapons, the test under <u>Terry</u> is objective; the officer need not be absolutely certain that the suspect is armed, but the situation must be such that a reasonably prudent man in the same circumstances would be warranted in the belief that his safety or the safety of others was in danger. <u>United States v. Roggeman</u>, 279 F.3d 573, 577-78 (8th Cir. 2002) (citations omitted). "The sole justification of the search . . . is the protection of the police officer, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." <u>Terry</u>, 392 U.S. at 29.

### B.    When an Investigatory Stop Becomes an Arrest

There is no bright line of demarcation between investigative stops and arrests. <u>See</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 685-86 (1985). "An action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." <u>United States v. Rose</u>, 731 F.2d 1337, 1342 (8th Cir. 1984) (citation omitted). An investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 790 (8th Cir. 1999).

### C.      Standard for an Arrest

Whether an arrest is lawful depends on the existence of probable cause, which means that the

facts and circumstances are "sufficient to warrant a prudent man in believing that the [suspect] had

committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).  As with reasonable

suspicion, probable cause may be based on the "collective knowledge of all law enforcement officers

involved in an investigation and need not be based solely upon the information within the knowledge of

the officer on the scene if there is some degree of communication." United States v. Twiss, 127 F.3d

771, 774 (8th Cir. 1997).  In establishing probable cause, police officers "enjoy substantial latitude in

interpreting and drawing inferences from factual circumstances." United States v. Horne, 4 F.3d 579,

589 (8th Cir. 1993).  While a bare suspicion of criminal activity is insufficient to establish probable

cause, the police need not have enough evidence to justify conviction before making a warrantless

arrest.  Brinegar v. United States, 338 U.S. 160, 175 (1949).  An informant's tip, in conjunction with a

controlled buy or other indication of illegal activity, may provide a "substantial basis" for finding

probable cause.  See United States v. Oropesa, 316 F.3d 762, 768-69 (8th Cir. 2003) (probable

cause found where informant revealed that defendant had sold him drugs and police taped

conversations of informant attempting to arrange a drug buy from the defendant).

### D.      Defendant Deleon-Bayardo

Defendant Deleon-Bayardo contends that he was arrested without probable cause when

Officer Peterson took away his cellular phone, pat-searched him, and detained him shortly after

entering the Apartment.  Defendant Deleon-Bayardo does not challenge Officer Peterson's entry into

the Apartment.  Rather, Defendant Deleon-Bayardo challenges the credibility of Officer Peterson's

testimony that when Officer Peterson stepped over the threshold of the Apartment, he saw a baggie on the floor and a marijuana pipe on the stove. According to Defendant Deleon-Bayardo, Defense Exhibit 5, which is a photograph of the Apartment taken from the doorway, reveals that Officer Peterson could not have seen the marijuana pipe on the stove as he stood in the door. Defendant Deleon-Bayardo also submits that possession of the baggie and the marijuana pipe was not an arrestable offense, but rather a petty misdemeanor for which a citation should have been issued.

The Government responds that Officer Peterson subjected Defendant Deleon-Bayardo only to an investigative detention in the Apartment, and that he was not arrested until after the officers had developed probable cause to do so. Alternatively, the Government argues that Defendant Deleon-Bayardo was lawfully detained and searched under Michigan v. Summers, 452 U.S. 692 (1981).

The Court will first address the protective sweep. Law enforcement officers may conduct a protective sweep of an area pending an application for a search warrant if there is a chance that evidence would be destroyed. United States v. Kulcsar, 586 F.2d 1283, 1287 (8th Cir. 1978). In addition, police may conduct such a search if probable cause and exigent circumstances exist. United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2006). Here, it was reasonable for Officer Peterson to believe that Defendant Deleon-Bayardo would destroy evidence inside the Apartment before the warrant arrived, especially considering that Defendant Deleon-Bayardo knew of the officers' presence. In addition, probable cause existed for the search, based on Brio's positive alert. See United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999). The potential for destruction of evidence was an exigent circumstance, as was the need to ensure Officer Peterson's safety. Accordingly, the protective sweep was lawful.

Next, the Court finds that Officer Peterson's initial detention of Defendant Deleon-Bayardo was supported by a reasonable suspicion of criminal activity, which quickly developed into probable cause for an arrest. The CI had informed Officer Peterson that occupants of the Apartment were engaged in narcotics trafficking, and Defendant Deleon-Bayardo clearly had access to the Apartment. Minutes earlier, Brio alerted the officers to the presence of controlled substances in the Apartment. Having observed Officer Peterson on the stand, the Court finds credible his testimony that he saw a baggie and a marijuana pipe when he stepped into the threshold of the Apartment. Officer Peterson explained that Defense Exhibit 5 was photographed from the right side of the doorway, whereas he was standing on the left side of the doorway, where he could see the stove. Probable cause existed by this time to arrest Defendant Deleon-Bayardo for suspected narcotics trafficking.

Likewise, Officer Peterson was justified in pat-searching Defendant Deleon-Bayardo for weapons to ensure officer safety during the initial detention. Officer Peterson was alone with Defendant in the Apartment, which represented a safety risk. Although Officer Peterson did not know whether other people were also in the Apartment, this would have been an even greater safety risk. As a trained narcotics officer, Officer Peterson was well aware of the strong nexus between narcotics trafficking and firearms. Officer Peterson did not exceed the permissible search limitations because he patted-down Defendant Deleon-Bayardo only for weapons.

The Court recommends denial of Defendant Deleon-Bayardo's motion to suppress evidence based on his detention and arrest.[2]

---

[2] Because the Court finds that probable cause existed for the detention and arrest of Defendant Deleon-Bayardo, the Court need not reach the question of whether Defendant Deleon-Bayardo was

13

### E.  Defendant Inda-Galaviz

Defendant Inda-Galaviz asks the Court to suppress evidence acquired pursuant to his arrest because the officers lacked probable cause to arrest him.  The Government responds that Defendant Inda-Galaviz was merely detained for an investigatory stop in the parking lot because officers had a reasonable suspicion that he was engaged in criminal activity.

The Court agrees that the <u>Terry</u> stop of Defendant Inda-Galaviz was lawful.  At the time Officer Peterson asked Officer Seeve to bring Defendant Inda-Galaviz to the Apartment, Officer Peterson had reason to suspect that Defendant Inda-Galaviz was engaged in narcotics trafficking. The CI had told Officer Peterson that several Hispanic males were engaged in narcotics trafficking from the Apartment, and Defendant Inda-Galaviz is a Hispanic male.  Officer Peterson saw Defendant Inda-Galaviz together with Defendant Deleon-Bayardo in the apartment complex.  When Officer Peterson attempted to enter the apartment building, Defendant Deleon-Bayardo called someone on his cellular phone, and Defendant Inda-Galaviz appeared and opened the door.  The rational inference is that Defendant Deleon-Bayardo called Defendant Inda-Galaviz.  In addition, prior to detaining Defendant Inda-Galaviz, Officer Peterson knew that Brio had alerted to the presence of narcotics in the Apartment.  Considering all of these facts, it was rational for Officer Peterson to infer that Defendant Inda-Galaviz had a connection to the Apartment and to Defendant Deleon-Bayardo.

Indeed, the factual information and resulting inferences were sufficient not only to justify the initial detention but also to form probable cause to believe that Defendant Inda-Galaviz was engaged in

---

lawfully detained and searched pursuant to <u>Michigan v. Summers</u>, 452 U.S. 692 (1981).

narcotics trafficking.  The existence of probable cause at this point is pivotal because when officers

handcuffed Inda-Galaviz and transported him to the RPD, where he was booked, searched, and

interviewed, the investigatory detention had clearly become tantamount to an arrest.  See Dunaway v.

New York, 442 U.S. 200, 212 (1979) (requiring a detention to be supported by probable cause

where the defendant was taken to the police station for questioning and was not free to leave, even

though he was not formally arrested); United States v. Caves, 890 F.2d 87, 89, 93 (8th Cir. 1989)

(finding that the transport of a vehicle passenger to the police station for "investigation purposes" was

clearly an arrest for Fourth Amendment purposes).  The Court therefore recommends that Defendant

Manuel Inda-Galaviz's motion to suppress physical evidence be denied.  Likewise, given that

Defendant Inda-Galaviz provides no basis for suppressing his post-arrest statement other than the

purported illegality of his arrest, the Court also recommends that his motion to suppress statements be

denied.

### F.    Defendant Aguilar-Lizama

Defendant Aguilar-Lizama argues that the police lacked reasonable suspicion to detain him and

never developed probable cause to arrest him.  He notes that the sole connection between him and the

Apartment was his presence in Defendant Inda-Galaviz's automobile.  The Government responds that

Officer Seeve had reasonable suspicion to initially detain Defendant Aguilar-Lizama and probable cause

to later arrest him.

As noted, Defendant Aguilar-Lizama was a passenger in a car driven by Defendant Inda-

Galaviz. When Officer Seeve encountered Defendant Aguilar-Lizama, the officer saw that he matched

the description of narcotics dealers given by the CI.  In addition, Defendant Aguilar-Lizama was in the

15

same car as Defendant Inda-Galaviz, whom Officer Seeve suspected was engaged in narcotics trafficking. These facts gave rise to a reasonable, articulable suspicion that Defendant Aguilar-Lizama was involved in criminal activity, which justified an investigatory detention.

However, Officer Seeve could not question Defendant Aguilar-Lizama because he did not speak English. The Government suggests that it was therefore necessary to transport Defendant Aguilar-Lizama to the police station for questioning through an interpreter, citing United States v. Rodriguez-Arreola, 270 F.3d 611 (8th Cir. 2001). In Rodriguez-Arreola, an officer detained a vehicle passenger, whom the officer suspected was an illegal alien, in order to investigate his immigration status. Id. at 614-15. Because the officer spoke English and the passenger spoke Spanish, the officer called an agent of the Immigration and Naturalization Service (INS) to question the passenger through the dispatch radio. Id. at 614. The extent of this investigatory detention was lawful. Id. at 617. However, Rodriguez-Arreola is significantly distinguishable from the case at hand. Specifically, expanding an investigatory stop in order to permit an INS agent to question a suspect over a dispatch radio at the scene does not equate to transporting a suspect to jail so that he may be questioned through an interpreter there, especially considering that Defendant Aguilar-Lizama was not merely questioned at the jail. He was also photographed, Mirandized, searched, and booked. Indeed, in Caves, the Eighth Circuit found that transporting a suspect to the police station for "investigation purposes" transformed a Terry stop into an arrest. 890 F.2d at 93.

Thus, the Court must determine whether reasonable suspicion ever evolved into probable cause before Defendant Aguilar-Lizama was taken to jail. "[M]ere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest."

United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983) (citations omitted).  "Nor is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes."  Id. (citations omitted).  In Everroad, the police saw the defendant riding in a car with a known drug dealer less than an hour before the police conducted a controlled buy of marijuana from the drug dealer.  Id.  However, this association was not sufficient to create probable cause to arrest the defendant.  Id.

Here, the sole basis to arrest Defendant Aguilar-Lizama was his presence in Defendant Inda-Galaviz's car and the fact that he was a Hispanic male.  No witness ever identified Defendant Aguilar-Lizama as being involved in drug dealing, and no drugs were found on his person when he was pat-searched.  There were no drugs recovered from the car, and there was no link between Defendant Aguilar-Lizama and the Apartment.  Defendant Aguilar-Lizama's inability to speak English did not create probable cause; Sergeant Flaherty could have called a translator to the scene or over his dispatch radio to effectuate the Terry stop.  The Court finds that no probable cause existed to arrest Defendant Aguilar-Lizama.

To overcome the lack of probable cause, the Government urges the Court to find that the inevitable discovery exception to the exclusionary rule applies to the evidence seized from Defendant Aguilar-Lizama.  Unlawfully obtained evidence need not be suppressed if the Government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997).  However, the

Government has not established either prong of the test.  Absent Defendant Aguilar-Lizama's presence at the police station, officers would not have discovered the evidence allegedly discarded by him in the interview room, nor would they have obtained his statement.  In addition, officers were not actively pursuing any alternative line of investigation at the time.  The inevitable discovery doctrine therefore does not apply.

Because Defendant Aguilar-Lizama's arrest was not supported by probable cause, the evidence subsequently obtained from him should be suppressed.  See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  The Government does not argue that an intervening circumstance removed the taint of the unlawful arrest, and Defendant Aguilar-Lizama would not have given the statement or allegedly discarded the contraband "but for" the illegal arrest.  Accordingly, Defendant Aguilar-Lizama's motions to suppress should be granted as to the balloons of heroin allegedly discarded by him at the police station and the statement he gave to officers.

Defendant Aguilar-Lizama also moves to dismiss the Indictment, contingent on the success of his motions to suppress.  He argues that the Court "should dismiss the charges against him based on insufficient evidence to proceed."  (Def.'s Mem. Supp. Mots. Suppress at 12.)  However, insufficient evidence is not a basis for dismissal of a facially valid indictment.  See Costello v. United States, 350 U.S. 359, 363-64 (1956).  Consequently, this motion should be denied.

### G.    Defendant Martinez-Bueno

Defendant Martinez-Bueno argues that the Court should suppress all evidence resulting from his investigatory stop and arrest.  He contends that Sergeant Flaherty lacked reasonable suspicion to stop

the vehicle in which he was traveling and that there was no probable cause to arrest him.[3]

Sergeant Flaherty conducted a <u>Terry</u> stop of Defendant Martinez-Bueno by pulling over the automobile in which he was riding.  At this point, the investigating officers had compiled a considerable amount of information.  Officers were acting on the CI's tip that several Hispanic males were trafficking heroin from the Apartment, and Defendant Martinez-Bueno is a Hispanic male.  Brio had alerted to the presence of narcotics at the Apartment door.  Once inside the Apartment, Officer Peterson saw a baggie and a marijuana pipe.  During a pat-down search of Defendant Deleon-Bayardo, the police had recovered two balloons of heroin.  When Defendant Martinez-Bueno threw snowballs at the Apartment, it was reasonable for Officer Peterson to infer that he was trying to contact the Apartment's residents.  Based on these facts, the Court finds that Sergeant Flaherty had reasonable suspicion to believe that Defendant Martinez-Bueno was engaged in criminal activity.

Defendant Martinez-Bueno next argues that Sergeant Flaherty illegally asked him to exit the car because the driver's possession of hypodermic needles did not warrant further investigation.  The possession of hypodermic needles is a criminal offense.  <u>See</u> Minn. Stat. § 151.40(a); <u>State v. Reese</u>, 446 N.W.2d 173, 179 (Minn. Ct. App. 1989).  There is a narrow exception for certain medical personnel, which does not apply here.  <u>See</u> Minn. Stat. § 151.40(a).  The Court finds that Gagnon's admitted, unlawful possession of hypodermic needles provided a basis for further investigation; in particular, Sergeant Flaherty was not bound to believe Gagnon's assertion that although he had

---

[3] Defendant Martinez-Bueno also maintains that Officer Peterson was in the Apartment in violation of the Fourth Amendment when he saw Defendant throw the snowballs.  As discussed below, however, Defendant Martinez-Bueno lacks standing to contest Officer Peterson's presence in the Apartment.

hypodermic needles, he did not have any drugs.  Asking Defendant Martinez-Bueno to exit the car

during the continued investigation was reasonable.  See Maryland v. Wilson, 519 U.S. 408, 409

(1997).

When Defendant Martinez-Bueno got out of the car, Sergeant Flaherty smelled a strong odor

of marijuana emanating from his person.  This, combined with the presence of hypodermic needles in

the car and the information from Officer Peterson, gave Sergeant Flaherty a reasonable suspicion to

justify searching Defendant Martinez-Bueno.  See United States v. Brown, 188 F.3d 860, 864-65 (7th

Cir. 1999) (upholding pat-search of defendant where reasonable suspicion was established by police

surveillance, the smell of marijuana, the defendant's demeanor, and the high-crime nature of the area);

see also United States v. Brown, 913 F.2d 570, 572 (8th Cir. 1990) ("Since weapons and violence are

frequently associated with drug transactions, the officers reasonably believed that the individuals with

whom they were dealing were armed and dangerous.").  The pat-search yielded 13.4 grams of

marijuana and a large amount of cash.  This evidence gave Sergeant Flaherty probable cause to arrest

Defendant Martinez-Bueno at this time.

In conclusion, Defendant Martinez-Bueno's stop and arrest pass muster under the Fourth

Amendment, and the Court therefore recommends that his motion to suppress physical evidence

obtained pursuant to his detention and arrest be denied.  Defendant Martinez-Bueno makes no

arguments in support of his motion to suppress statements other than that any statements were the result

of an unlawful detention and arrest, and the Court therefore recommends denial of this motion as well.

IV.  **MOTIONS TO SUPPRESS EVIDENCE SEIZED FROM THE APARTMENT**[4]

A.  **Reasonable Expectation of Privacy**

All Defendants seek to suppress evidence seized from the Apartment pursuant to the search warrant.  The Government responds that Defendants Inda-Galaviz, Martinez-Bueno, and Aguilar-Lizama lack standing to challenge the search of the Apartment, and relatedly, that Defendant Martinez-Bueno lacks standing to challenge Officer Peterson's presence in the Apartment.  According to the Government, these Defendants have not met their burden to show that they had reasonable expectations of privacy in the Apartment.

A defendant has standing to challenge the admission of illegally obtained evidence only if the defendant's own constitutional rights have been violated.  See Rakas v. Illinois, 439 U.S. 128, 134 (1978).  The Supreme Court has held that a person's Fourth Amendment rights are not infringed if that person "is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property . . . ."  Id.  In Fourth Amendment challenges, whether a defendant has standing to challenge a search depends on whether he had a subjective and reasonable expectation of privacy in the area searched or the items seized.  See Minnesota v. Carter, 525 U.S. 83, 91 (1998).   The person challenging the search bears the burden of establishing a subjective expectation of privacy and that the expectation is objectively reasonable, meaning one that society is willing to expect.  See Minnesota v. Olson, 495 US. 91, 96-97 (1990).

In Olson, the Supreme Court held that in some circumstances, a person may have a legitimate

---

[4] No Defendant challenges the search of the vehicle in which Defendants Inda-Galaviz and Aguilar-Lizama were riding or the search of the storage locker.

expectation of privacy in the house of another person.  Of particular relevance here is an overnight

guest's expectation of privacy.  "To hold that an overnight guest has a legitimate expectation of privacy

in his host's home merely recognizes the everyday expectations of privacy we all share.  Staying

overnight in another's home is a longstanding social custom that serves functions recognized as valuable

to society."  Id. at 98-99.  In comparison, a person who visits a residence for only two and a half hours

for the purpose of conducting business does not have a legitimate expectation of privacy.  Carter, 525

U.S. at 90.  In addition, property used for commercial purposes, such as the sale of narcotics, is treated

differently under the Fourth Amendment.  Id.  Thus, in reconciling Carter and Olson, it may be fairly

said that an overnight guest does not have a per se legitimate expectation of privacy in his host's home;

rather, a court must consider all the circumstances in determining whether the expectation of privacy is

legitimate.  United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003).

     The Court received very little evidence during the suppression hearing regarding the

Defendants' respective expectations of privacy in the Apartment.  In Defendant Inda-Galaviz's

statement to police, he said that he had lived at the Apartment for three days, but he also said that the

other occupants were going to teach him how to sell drugs.  Giving Defendant Inda-Galaviz the benefit

of the doubt, the Court finds that he has shown standing to contest the search of the Apartment.

Defendant Aguilar-Lizama also told police that he had slept at the Apartment the night before, and there

is no indication that he was involved in the commercial aspect of selling drugs from the Apartment.

Thus, the Court finds he also has standing.

     On the other hand, the only evidence from Defendant Martinez-Bueno is that he lived at a

different address than the Apartment.  Consequently, Defendant Martinez-Bueno did not have a

legitimate expectation of privacy which would permit him to contest either the search warrant or Officer Peterson's presence in the Apartment.  His motion to suppress evidence should be denied insofar as it pertains to the evidence seized pursuant to the search warrant at the Apartment.

### B.      The Search Warrant

Defendants Deleon-Bayardo, Inda-Galaviz, and Aguilar-Lizama argue that the search warrant for the Apartment was not supported by probable cause.  In addition, Defendant Deleon-Bayardo seeks a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), due to purported inconsistencies between Officer Peterson's testimony and the facts set forth in Officer Majewski's affidavit in support of the search warrant.

### 1.      Probable Cause

Defendants argue that the affidavit in support of the search warrant fails to set forth probable cause because the CI's tip was stale and insufficiently corroborated, and because the information about Brio was insufficient.  "It is well-established that courts may <u>not</u> look to facts outside the affidavit in determining the existence of probable cause."  <u>United States v. Martin</u>, 833 F.2d 752, 757 (8th Cir. 1987) (Lay, C.J., concurring).  Rather, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  <u>United States v. Leichtling</u>, 684 F.2d 553, 555 (8th Cir. 1982).  "Probable cause exists if, based upon a common-sense consideration of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  <u>United States v. Curry</u>, 911 F.2d 72, 75 (8th Cir. 1990) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there

is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556 (1978).

Importantly, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" as to whether a showing of probable cause has been made. <u>Gates</u>, 462 U.S. at 235. Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" <u>Id.</u> at 231 (citations omitted). "[T]he preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination" as to the existence of probable cause. <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984); <u>see also</u> <u>Gates</u>, 462 U.S. at 236-37. In this regard, this Court does not make a de novo review of the sufficiency of the affidavit. <u>Gates</u>, 462 U.S. at 236; <u>see also</u> <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986). Instead, "the decision to issue the warrant is to be upheld if supported by substantial evidence in the record," <u>Reivich</u>, 793 F.2d at 959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." <u>Gates</u>, 462 U.S. at 236. Moreover, a court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." <u>United States v. Carlson</u>, 697 F.2d 231, 238 (8th Cir. 1983).

Turning to Defendants' precise arguments, there is no "fixed formula" to determine when information supporting a warrant becomes stale. <u>United States v. Stevens</u>, 439 F.3d 983, 988 (8th Cir. 2005). The Court must "consider the nature of the crime being investigated and the property to be

searched."  Id.  Although it is true that "information of an unknown and undetermined vintage relaying

the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics could

quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation,"

United States v. Kennedy, 427 F.3d 1136, 1142 (8th Cir. 2005), the CI's information in the present

case was not stale.  The CI  first informed officers about heroin and cocaine trafficking from the

Apartment on January 26, 2007.  On February 22, 2007, the CI and Officer Majewski went to the

Apartment and identified the particular unit under investigation.  Six days later, Officer Peterson went to

the Apartment to further investigate by conducting a canine sniff, and the result of the canine sniff was

corroboration of the CI's tip that controlled substances were located in the Apartment.  The affidavit

relayed this series of events, which indicated an ongoing narcotics trafficking operation.

Defendant Deleon-Bayardo also challenges the reliability of the canine sniff by alleging that

Officer Majewski's affidavit lacked specific information about Brio's reliability such as Brio's record of

false positives and her training.  However, "[a] dog's positive indication alone is enough to establish

probable cause for the presence of a controlled substance if the dog is reliable."  Sundby, 186 F.3d at

876.  Reliability is established if the affidavit attests that  "the dog has been trained and certified to

detect drugs." Id.  The affidavit need not include details of the dog's education or track record.  Id.   In

the case at hand, the affidavit attested that Brio was a United States Police Canine Association certified

narcotics detector dog and described Brio's trained method of alerting.  This was sufficient to establish

Brio's reliability.

Defendant Deleon-Bayardo next argues that the affidavit described Brio as trained in detecting

only marijuana, cocaine, and methamphetamine, and therefore, Brio was not qualified to assist in the

25

investigation of a heroin trafficking operation.  Defendant misstates the affidavit.  The affidavit averred

that Brio was trained to sit when she detected the odor of "narcotics" and merely listed cocaine,

marijuana, and methamphetamine as examples, not an exhaustive list of the narcotics which Brio could

detect.  Further, Officer Majewski related that the CI had reported heroin <u>and</u> cocaine trafficking at the

Apartment, which is consistent with Brio's training as described in the affidavit.

The affidavit in support of the search warrant contained facts concerning the CI's tip,

corroboration of the CI's information, the positive canine sniff, and the presence of drug paraphernalia

in the Apartment.  Ample probable cause existed to justify a search of the Apartment.

### 2.      <u>Franks</u> Hearing

Defendant Deleon-Bayardo seeks a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154

(1978).  Under <u>Franks</u>, a defendant is entitled to an evidentiary hearing if he "makes a substantial

preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the

truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary

to the finding of probable cause."  <u>Id.</u> at 155-56.  A defendant may make this showing by proving that

the affiant deliberately or recklessly omitted a truthful statement from his warrant affidavit.  <u>United</u>

<u>States v. Searcy</u>, 181 F.3d 975, 980 n.9 (8th Cir. 1999).

> There must be allegations of deliberate falsehood or of reckless disregard for the truth,
> and those allegations must be accompanied by an offer of proof.  They should point out
> specifically the portion of the warrant affidavit that is claimed to be false; and they
> should be accompanied by a statement of supporting reasons. Affidavits or sworn or
> otherwise reliable statements of witnesses should be furnished, or their absence
> satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

<u>Franks</u>, 438 U.S. at 171.  "A mere allegation standing alone, without an offer of proof in the form of a

sworn affidavit or some reliable corroboration, is insufficient to make the difficult preliminary showing." United States v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998).

Defendant Deleon-Bayardo argues that there were two[5] material differences between Officer Majewski's affidavit and Officer Peterson's testimony, and thus, Officer Peterson intentionally or recklessly manipulated facts in order to bolster the affidavit. One difference is whether the baggie was in the kitchen or the hallway of the Apartment. The other disparity is whether Officer Peterson could see into the kitchen from his vantage point in the threshold of door.

As an initial matter, Defendant Deleon-Bayardo has failed to show the materiality of whether Officer Peterson saw the baggie in the kitchen or the hallway. Furthermore, Officer Majewski, not Officer Peterson, was the affiant, and Defendant Deleon-Bayardo has not shown that Officer Majewski intentionally or recklessly misstated or omitted any facts from his affidavit. As to whether Officer Peterson could see into the kitchen from the threshold, the Court has already found him credible on this point. Finally, even if Defendant Deleon-Bayardo had shown the statements to be false, sufficient probable cause remains to support the validity of the warrant. Officer Majewski knew from the CI that cocaine and heroin trafficking were occurring from the Apartment, and he also knew that Brio had alerted to the presence of narcotics at the Apartment door. Indeed, the canine sniff alone constituted probable cause to search the Apartment for narcotics. See Sundby, 186 F.3d at 876. Accordingly, Defendant Deleon-Bayardo is not entitled to a Franks hearing.

---

[5] Defendant Deleon-Bayardo concedes that the number of marijuana pipes—one or two—is immaterial.

## V.      MOTIONS TO SUPPRESS EYEWITNESS IDENTIFICATIONS

Defendants Deleon-Bayardo and Martinez-Bueno seek to suppress identifications made by

Glen, Bell, and Kennedy.  These identifications consist of the identification by Bell at the Apartment on

February 28, 2007, and subsequent identifications made by Bell, Glen, and Kennedy at the RPD.

Defendants submit that both the photograph composite and the photograph lineup were unduly

suggestive.  They also fault the Government for not providing enough evidence about the circumstances

surrounding the composite and lineup to assess whether there was a significant likelihood of irreparable

misidentification.

The Fifth Amendment Due Process Clause prohibits identification testimony derived from

impermissibly suggestive procedures that might lead to an irreparably mistaken identification.  United

States v. Robinson, 441 F. Supp. 2d 1029, 1040 (D. Minn. 2006) (citing Neil v. Biggers, 409 U.S.

188 (1972)).  Therefore, "[i]t is the likelihood of misidentification which violates a defendant's right to

due process."  Biggers, 409 U.S. at 198.

> The test for determining whether identification procedures are unduly suggestive is a
> two step inquiry. The first question is whether the procedures were suggestive while the
> second inquiry is whether, considering the totality of the circumstances, the suggestive
> procedures gave rise to a substantial likelihood of irreparable misidentification.

United States v. Briley, 726 F.2d 1301, 1306 (8th Cir. 1984).

The Government does not deny that the notations underlying each Defendant's picture in the

photograph composite are suggestive of criminal activity, as is the jail cell backdrop.  However, even

though the composite was suggestive, the likelihood of misidentification was very small.  The composite

was shown to Bell in the course of a quickly evolving investigation, and the purpose was to verify which

Defendants were associated with the Apartment.  See Simmons v. United States, 390 U.S. 377, 385 (1968) (upholding identifications where law enforcement showed only pictures of the two suspects to witnesses on the scene).  There was no suggestion, such as an address, as to which Defendants were associated with the Apartment.  In addition, all of the photographs on the composite were suggestive in the same way.  All four photographs had notations relating to criminal activity, and all four photographs were taken in a jail cell.  Thus, the Court finds that no one photograph suggested anything more than the others.

If an identification procedure is impermissibly suggestive, however, admissibility of the identification depends on "whether, under the totality of the circumstances, the identification was reliable despite any suggestive or inappropriate pre-trial identification techniques."  Trevino v. Dahm, 2 F.3d 829, 833 (8th Cir. 1993) (citation omitted).  In determining reliability, the Court must consider: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the photographic display; and (5) the length of time between the crime and the photographic display."  Palmer v. Clarke, 408 F.3d 423, 435 (8th Cir. 2005) (citing Biggers, 409 U.S. at 199).

Although the record before the Court is sparse regarding these factors, the Court concludes that Bell's identifications at the scene were reliable.  Bell had contact with one or more of the Defendants when he previously bought heroin at the Apartment, and he had been purchasing heroin from the Apartment for about a year.  The gap in time between Bell's attempt to purchase heroin on February 28, 2007 and the identifications was minimal.  There is no indication that the previous heroin

purchases occurred long in the past. When questioned about the identifications, Officer Peterson did not indicate that Bell was inattentive or uncertain. Defendants Deleon-Bayardo and Martinez-Bueno have presented no evidence, merely speculation, that the identifications were not reliable. The Court consequently recommends that the identifications made by Bell at the Apartment on February 28, 2007, be deemed reliable.

With respect to the identifications made by Bell, Glen, and Kennedy at the RPD, the Court has viewed the photograph lineups and finds they are not suggestive. Consequently, the Court does not reach the question of reliability. See Palmer, 408 F.3d at 435-36. These identifications should also be deemed reliable.

## VI.     MOTION TO SUPPRESS BASED ON DISCOVERY VIOLATIONS

Defendant Martinez-Bueno moves to suppress evidence because the Government did not timely disclose certain evidence as required under Federal Rule of Criminal Procedure 16. Specifically, Defendant Martinez-Bueno faults the Government for not producing the photograph lineups, the actual Polaroid photographs, and certain police reports. Defendant claims that the late disclosure prejudiced his ability to prepare for the criminal motions hearing.

Federal Rule of Criminal Procedure 16(d)(2)(C) permits the Court to penalize a party who fails to disclose evidence by prohibiting the party from introducing it. Although the Court certainly does not sanction delays in discovery production, suppression is too harsh a penalty here. Defendant Martinez-Bueno's counsel was able to question Officers Peterson and Flaherty at the suppression hearing and was given permission to submit argument in a post-hearing memorandum. Defendant Martinez-Bueno was not prohibited from calling additional officers or witnesses to the testify at the hearing if he had so

30

desired.  Moreover, Defendant Martinez-Bueno received the discovery well in advance of trial.  <u>See</u>

<u>United States v. White Horse</u>, 316 F.3d 769, 774 (8th Cir. 2003).  Finally, Defendant Martinez-Bueno

has not demonstrated that the late disclosure was material, meaning that had the Government timely

disclosed the information, the disposition of the suppression issues would have been different.  <u>See</u>

<u>Patterson v. Black</u>, 791 F.2d 107, 110 (8th Cir. 1986) (citations omitted).  Defendant Martinez-

Bueno's motion to suppress evidence for discovery violations should be denied.

## VII.    CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED that:**

1.      Defendant Jhonnathan Deleon-Bayardo's Motion to Suppress Physical Evidence

Obtained as a Result of Searches, Seizures, or Identification Procedures (Doc. No. 59)

be **DENIED**;

2.      Defendant Manuel Inda-Galaviz's Motion to Suppress Physical Evidence (Doc. No.

43) be **DENIED**;

3.      Defendant Manuel Inda-Galaviz's Motion to Suppress Statement, Admissions and

Answers (Doc. No. 47) be **DENIED**;

4.      Defendant Ramon Aguilar-Lizama's Motion to Suppress Any Evidence Found Incident

to Unlawful Arrest (Doc. No. 36) be **GRANTED**;

5.      Defendant Ramon Aguilar-Lizama's Motion to Dismiss Counts 1 and 2 of the

Indictment (Doc. No. 37) be **DENIED**;

6.      Defendant Ramon Aguilar-Lizama's Motion to Suppress Any Evidence Obtained as a

Result of Search and Seizure (Doc. No. 38) be **GRANTED** as to the evidence

recovered from or near his person at the RPD, but **DENIED** in all other respects;

7.      Defendant Ramon Aguilar-Lizama's Motion to Suppress Statements, Admissions, and

Answers (Doc. No. 39) be **GRANTED**;

8.      Defendant Hector Martinez-Bueno's Pretrial Motion to Suppress Evidence (Doc. No.

73) be **DENIED**;

9.      Defendant Hector Martinez-Bueno's Pretrial Motion to Suppress Evidence Obtained

as a Result of Search and Seizure (Doc. No. 74) be **DENIED**;

10.     Defendant Hector Martinez-Bueno's Pretrial Motion to Suppress Statements,

Admissions, and Answers (Doc. No. 75) be **DENIED**; and

11.     Defendant Hector Martinez-Bueno's Motion to Suppress Eyewitness Identifications

(Doc. No. 79) be **DENIED**.


Dated: <u>June 18, 2007</u>

<u>  s/Susan Richard Nelson  </u>
SUSAN RICHARD NELSON
United States Magistrate Judge


Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by **July 3, 2007,** a writing which specifically identifies
those portions of this Report to which objections are made and the basis of those objections.  Failure to
comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in
the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service
thereof.  A judge shall make a de novo determination of those portions to which objection is made.
This Report and Recommendation does not constitute an order or judgment of the District Court, and it
is therefore not appealable to the Court of Appeals.